IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JUDY D. CORDTS                                                              PLAINTIFF

v.                    Civil No. 05-2155

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                              DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Judy D. Cordts, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act. The court has before it the brief of the briefs of the parties (Doc. 11 & Doc. 12) and the transcript of the social security proceedings.

**Procedural Background:**

Cordts filed her application for DIB on February 21, 2003. (Tr. 15, 55-57). She alleged a disability onset date of December 24, 2002, due to rheumatoid arthritis with associated pain, shortness of breath, difficulty controlling her kidneys, panic attacks, depression, concentration problems, and short term memory loss. (Tr. 15, 36).

Cordts' application was denied initially and on reconsideration. (Tr. 28-29, 30-31). She requested a hearing before an ALJ. (Tr. 40). A hearing was held on April 7, 2004. (Tr. 180-225). Cordts appeared and testified. (Tr. 186-213, 216-220). Cordts was represented by counsel. (Tr. 182). Cheryl Richardson, Cordts' friend, and Tanya Owen, a vocational expert, also testified. (Tr. 213-215, 215-216, 219-223).

By written decision dated November 17, 2004, the ALJ found that while the evidence established Cordts had rheumatoid arthritis and degenerative disc disease in her cervical spine and lumbar spine, impairments that were severe, there was no medical evidence of an impairment that met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16). The ALJ the concluded Cordts did not have a severe mental impairment. (Tr. 18-19).

The ALJ concluded Cordts had the residual functional capacity (RFC) to perform light work with only occasional crouching, kneeling, crawling, and working overhead and never climbing ropes, ladders, or scaffolds. (Tr. 23). With this RFC it was concluded Cordts could return to her past relevant work as a convenience store cashier. (Tr. 24). The ALJ therefore found Cordts not disabled within the meaning of the Social Security Act. (Tr. 20).

On November 19, 2004, Cordts requested a review on the record. (Tr. 10). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Cordts' request for review. (Tr. 4-7).

**Evidence Presented:**

At the hearing before the ALJ, Cordts testified she was forty-seven years old. (Tr. 186). She completed the eleventh grade and then obtained her general equivalency diploma (GED). (Tr. 187). She can read, write, add, and subtract okay. (Tr. 188).

She lives with her husband. (Tr. 187). She testified she weighed a little over 190 and had gained close to fifty pounds as a result of a prescription medication, Arava, she was on. (Tr. 187).

AO72A
(Rev. 8/82)

She last worked at the Midland Mini-Mart. (Tr. 188). She had difficulty climbing the ladders to do the cleaning on the top of the aisles. (Tr. 189). She was also having a lot of problems dropping things and breaking them. (Tr. 189). Additionally, the Arava was causing her to have bad bouts of diarrhea and since she was the only employee she would have to lock the doors, lock the cash register, and turn off the pumps before she could go to the restroom. (Tr. 189). Cordts also testified she had worked in various positions in fast food restaurants including as a manager, in a factory running a parts room, and as a forklift driver. (Tr. 190-193). Cordts indicated she no longer drove although she had a driver's license. (Tr. 194).

Cordts testified she had a protruding disc in her neck replaced with a cadaver disc in 2000. (Tr. 190-191, 209-210). Prior to the surgery, she had been having a lot of neck pain, headaches, and her arms and fingers would go numb or tingle. (Tr. 210). The surgery helped with her right arm but not with her left. (Tr. 210). Cordts testified the strength is still not there in her arms and she has noticed her fingers are starting to tingle. (Tr. 210). Her neck also pops and grinds and she has pain on occasion. (Tr. 210).

She indicated she had been taking Arava for rheumatoid arthritis since the prior January. (Tr. 194-195, 199). The side effects are weight gain and diarrhea. (Tr. 194).

Cordts testified she is in pain everyday in her lower back, her left leg, and her left arm. (Tr. 202). She stated the pain some days is like a dull toothache and other days it's like an open wound that has salt poured in it. (Tr. 202).

Cordts testified the pain interferes with her concentration. (Tr. 202). If she doesn't concentrate "really hard" on what she is doing, she can't complete it. (Tr. 202). She indicated it took her almost a week to finish the paperwork she got from the ALJ. (Tr. 202).

AO72A
(Rev. 8/82)

She has problems standing and walking because her legs go numb. (Tr. 203). If she sits for very long, even just going to the bathroom, her legs gone numb. (Tr. 203). If she props her leg up a bit her toes don't go as numb. (Tr. 203). Sitting at the hearing caused her lower back to throb like a toothache. (Tr. 203).

Cordts testified she walks with a cane to keep her balance. (Tr. 204). She indicated she had problems falling down and couldn't get up by herself if she fell down. (Tr. 204).

Cordts indicated her feet swell and her fingers stay swelled enough that she can't get any of her rings on. (Tr. 204). She buys her shoes in an extra wide size so that if her feet swell she can still wear them. (Tr. 204). Most of the swelling is in her feet and hands. (Tr. 204). Her back is also acting up a lot. (Tr. 204).

Cordts indicated she cannot lift a gallon of milk with one hand. (Tr. 205). Her husband, sister-in-law, and brother-in-law take care of most of the cooking and household chores. (Tr. 205). If Cordts attempts to do the household chores, she gets out of breath and has to sit down. (Tr. 206). It takes her three times as long to get anything done. (Tr. 206).

If she bends or stoops, she can't pull herself back up. (Tr. 206). If she climbs a flight of stairs, she has to rest part of the way up for a few minutes and then has to sit down at the top of the stairs for a few minutes to rest. (Tr. 206).

Cordts testified she does not have much grip strength in her left hand. (Tr. 207). Her writing is very difficult to read and she indicated she can no longer do cake decorating or dog grooming. (Tr. 207).

She also testified she had problems with depression and panic attacks. (Tr. 200). With respect to the panic attacks, Cordts testified she started having them about six or seven months

AO72A
(Rev. 8/82)

ago. (Tr. 201). When she leaves home, Cordts testified she sometimes just starts fussing, screaming, and crying at her husband for the way he is driving and they will turn around and go home. (Tr. 200-201). Other times, Cordts indicated they will get where they are going and she will not be able to go in. (Tr. 201). She stated she will start shaking and is useless. (Tr. 201). She also indicated she has difficultly being around too many people or in crowds. (Tr. 201). She testified there were a lot of days she did not go out of the house and if someone came up her husband went outside to talk to them. (Tr. 202).

With respect to depression, Cordts testified she had problems in the past and it has gotten worse. (Tr. 207). Cordts began getting counseling and taking medication. (Tr. 201). She testified she was on Zoloft for three weeks and was taking Diazepam until the Zoloft got into her system. (Tr. 195). The medication and counseling have provided some relief. (Tr. 201 & 207).

She indicated Dr. Barton told her the blood tests showed she was sixty-eight percent positive for rheumatoid arthritis and referred her to Dr. Deneke who continued to see for her rheumatoid arthritis. (Tr. 195-196, 199). She stated she had gone to Dr. Hodge an internal medicine doctor twice. (Tr. 196).

Cordts has no health insurance. (Tr. 207). Dr. Hodge is her friend, Cheryl Richardson's doctor. (Tr. 196). Cheryl told Dr. Hodge about Cordts' situation and Dr. Hodge was willing to let Cordts make payments. (Tr. 197). Because of this, Cordts was able to start seeing Dr. Hodge. (Tr. 197). Cordts testified Dr. Hodge had put her on Trazodone to help her sleep and had given her another prescription for Mobic. (Tr. 197).

AO72A
(Rev. 8/82)

Cordts testified she can longer go dancing, bowling, ride motorcycles, ride horseback, or do beadwork. (Tr. 208). She now spends her time watching television and laying down most of the time although she has to change positions frequently. (Tr. 210-211).

Cordts testified she has problems sleeping. (Tr. 211). She is usually up between 3:30 and 4:00 a.m. for an hour or two and just wanders the house. (Tr. 211). When she gets up in the morning, she is very tired. (Tr. 212).

Cheryl Richardson testified she has been friends with Cordts for about a year. (Tr. 213). Richardson either talks to, or sees, Cordts everyday. (Tr. 214).

Richardson testified Cordts really needs medical help. (Tr. 214). According to Richardson, Cordts has been going "down more and more." (Tr. 214). Richardson testified Cordts couldn't go anywhere by herself. (Tr. 214).

Richardson testified she has seen Cordts when she in really bad pain. (Tr. 214). Richardson has seen Cordts having crying spells many times and Cordts will call and just be in hysterics. (Tr. 214).

Tanya Owen, a vocational expert, was asked a series of hypothetical questions. (Tr. 221-225). For each hypothetical question, Owen was to assume they were talking about an individual who had the same chronological, vocational, and educational background as Cordts. (Tr. 221). Owen was then asked to assume the individual only had the RFC to perform light work with the following restrictions:

> this person's ability to engage in the full range of light work is further restricted by being only occasionally able to crouch, kneel, crawl, work overhead. This person may not use ropes, ladders, scaffolds. Now, I want you to assume this person can only frequently reach and this person can only frequently finger with both upper extremities and both hands.

-6-

(Tr. 221). Owen testified Cordts' past relevant work as a convenience store cashier would be within those limitations. (Tr. 222).

If the hypothetical individual needed a five-minute bathroom break an average of one time per hour, Owen indicated the individual could maintain gainful employment only with accommodation. (Tr. 223). She indicated this would be outside the normal breaks that are required. (Tr. 223).

Cordts' counsel then asked Owen to assume the hypothetical claimant could not perform a full eight-hour day sitting, standing and walking and could not sit for six hours or stand and walk for two hours out of an eight-hour day. (Tr. 223). Owen testified this would eliminate all jobs the claimant could perform. (Tr. 223).

The medical and vocational evidence in the transcript reveals the following. On December 27, 2000, Cordts was seen by Dr. Michelle Patterson. (Tr. 179). Cordts reported problems with her hands swelling and being numb with stiffness for about an hour each morning. (Tr. 179). She also reported having some difficulties in the shoulders and hips. (Tr. 179). She indicated it took awhile for her joints to loosen up. (Tr. 179). She was diagnosed with arthritis and prescribed Celebrex. (Tr. 179).

On January 3, 2003, Cordts was seen by Dr. James Deneke for a rheumatology consult based on a referral by Dr. Barton. (Tr. 109). Cordts reported some pain on motion in her neck, aching in her shoulders, more on the right than left, swelling in her distal forearms, more on the right than left, and pain in her wrists. (Tr. 109). She indicated her hands swell and hurt when she used them and her grip was decreased. (Tr. 109). She noted her knees may catch when she first stands up and they feel weak with steps. (Tr. 109). She reported occasional lower back

AO72A
(Rev. 8/82)

problems that may worsen with lifting. (Tr. 109). She indicated she had two to three hours of morning stiffness. (Tr. 109). Celebrex did not help. (Tr. 109). Naprosyn helped some. (Tr. 109). However, she stated she got the most relief from Arthritis Strength BC. (Tr. 109).

Upon examination, it was noted Cordts had a little tenderness of the temporomandibular joints, good range of motion without pain in the shoulders, hips, and back, good range of motion without pain or swelling of the elbows, knees, and ankles, probably 1+ swelling with some tenderness and pain on motion of the wrists, pain on flexion of the fingers with 0 to 1+ swelling of the second metacarpophalangeal (MCP) joints bilaterally, some tenderness as well of the third MCP joints, and some tenderness of the metatarsophalangeal (MTP) joints of the feet without clear swelling. (Tr. 110). Dr. Deneke's assessment was: inflammatory arthritis, likely representing early rheumatoid arthritis although the possibility of Sjogren's syndrome has to be kept in mind; and hypertension by history. (Tr. 110).

Cordts was prescribed salsalate. (Tr. 111). However, a clinic note dated January 10, 2003, indicates Cordts couldn't tolerate the salsalate because of nausea and stomach cramps. (Tr. 108). She was told to try 800 mg. of Ibuprofen three times a day with meals. (Tr. 108).

On February 12, 2003, Cordts completed a supplemental interview outline. (Tr. 70-74). She indicated she could dress and take care of her own hair but needed assistance getting in and out of the bathtub. (Tr. 70). She stated she could do laundry, dishes, change sheets, iron, and vacuum/sweep. (Tr. 70). She indicated she could not do garden work because she could not stoop. (Tr. 70).

She stated she could shop for groceries, clothes, do the banking, and go to the post office. (Tr. 70). She indicated she prepared meals seven times a week including sandwiches, frozen

dinners, meats, vegetables, desserts, and dishes that require a recipe. (Tr. 71). She indicated it took her thirty minutes to an hour to prepare a meal and took longer since her disability began. (Tr. 71).

Cordts indicated she could pay bills, use a checkbook, and count change. (Tr. 71). She indicated she can drive, including along unfamiliar routes, walk for exercise or errands, and use public transportation. (Tr. 71). She uses no assistive devices. (Tr. 71). She spends her time watching television, reading, and visiting with friends and relatives. (Tr. 71).

She indicated her disability had made her quit her job or she had been fired in two times. (Tr. 71). She stated she couldn't do everything that was required for the job. (Tr. 71).

She indicated she had suffered from unusual fatigue since April of 2002 and had to rest once a day for thirty minutes to an hour. (Tr. 72). When asked to describe her pain or other symptoms, Cordts replied that it was like constant throbbing and toothache. (Tr. 72). When asked where her pain was located, she indicated her hands, feet, and knees. (Tr. 72). She indicated the pain was constant. (Tr. 72).

Cordts stated that everything causes the pain and it does not go away. (Tr. 72). When asked how long she could stand, walk, and sit before the pain occurred, Cordts did not respond. (Tr. 72).

Since her disability began on an average day, Cordts indicated she fixes breakfasts, rests, watches television, maybe fixes lunch, takes a nap, watches television, washes the breakfast dishes, fixes dinner, and then watches television until bed time. (Tr. 73). Before her disability began, Cordts indicated she could work full-time, keep her house clean, and work on the yard.

(Tr. 73). Now Cordts indicated she is not very active, has gained weight, and can't do much at a time. (Tr. 73).

On March 31, 2003, Cordts was seen by Dr. Deneke for a follow-up on "presumed rheumatoid arthritis." (Tr. 107). Cordts didn't believe the 800 mg. of Ibuprofen she had been taking six times a day was helping. (Tr. 107). She reported being quite stiff and painful. (Tr. 107).

On examination, she had scattered tenderness and swelling similar to her initial examination. (Tr. 107). Cordts was started on prednisone and Arava. (Tr. 107). Dr. Deneke stressed that the Arava could cause serious side effects and if she had any questions or problems she was to call. (Tr. 107).

On April 15, 2003, a medical consultant, completed a residual physical functional capacity assessment on Cordts. (Tr. 96-103). With respect to exertional limitations, it stated Cordts could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as show for lift and/or carry. (Tr. 97). No postural, manipulative, visual, communicative or environmental limitations were established. (Tr. 98-100).

On April 28, 2003, Cordts was seen by Dr. Deneke for a follow-up on her rheumatoid arthritis. (Tr. 104). There was no swelling in her elbows, wrists, knees or ankles. (Tr. 104). Dr. Deneke indicated Cordts hands had a little flexor swelling with some tenderness to lateral compression of the MCP joints. (Tr. 104). Dr. Deneke believed Cordts was better. (Tr. 104). Cordts was continued on Arava and prednisone. (Tr. 104).

AO72A
(Rev. 8/82)

On June 20, 2003, Cordts was seen by Dr. Deneke. (Tr. 166). Cordts reported experiencing some stomach upset and diarrhea, particularly the last couple of weeks, despite being on Imodium AD. (Tr. 166). There was no swelling of her elbows, wrists, hands, knees, or ankles. (Tr. 166). Dr. Deneke noted her arthritis was doing well. (Tr. 166).

Cordts was seen by Dr. Barton on July 8, 2003. (Tr. 113). She complained of a rapid heart rate, shortness of breath, night sweats, diarrhea, being unable to sleep, and an increase in stress. (Tr. 113). Dr. Barton diagnosed Cordts with anxiety/depression, diarrhea, and insomnia. (Tr. 113).

On August 4, 2003, Dr. Jerry Thomas, a medical consultant, completed a residual physical functional capacity assessment on Cordts. (Tr. 114-121). With respect to exertional limitations, it stated Cordts could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as show for lift and/or carry. (Tr. 115). No postural, manipulative, visual, communicative or environmental limitations were established. (Tr. 116-118).

On August 4, 2003, Cordts was seen by Dr. Deneke. (Tr. 163). Cordts had been on Arava since March and reported the diarrhea was better when she was on 20 mg. every other day. (Tr. 163). The arthritis was definitely better. (Tr. 163). She had no swelling of the hands, knees, ankles, or feet. (Tr. 163).

Cordts was seen by Dr. Deneke on November 3, 2003. (Tr. 160). It was noted she was having diarrhea from the Arava. (Tr. 160). She was told to start on Metamucil or Citrucel every day. (Tr. 160). There was no swelling of her elbows, wrists, hands, knees, or ankles. (Tr. 160).

On February 5, 2004, Cordts underwent an intake assessment by Sharon Strawn, a licensed certified social worker, at the Western Arkansas Counseling and Guidance Center. (Tr. 125-128). She was referred by her husband's psychiatrist. (Tr. 125). Cordts presented with symptoms of depression that had gradually gotten worse since both her husband and son were diagnosed with cancer in 2002. (Tr. 125). She reported losing both her parents in 2002. (Tr. 125).

Cordts indicated she was crying frequently, having difficulty sleeping, feeling restless frequently, having difficulty remembering things, feeling nervous around people, experiencing a decreased appetite, and having a lot of guilt feelings. (Tr. 125). She also reported problems with anxiety. (Tr. 125).

At the time of the evaluation, both Cordts' husband and son were doing well. (Tr. 125). Cordts had not worked in about two years. (Tr. 126). She indicated this was because she had developed diarrhea as a side effect of medication that she takes and had found it difficult to maintain employment. (Tr. 126). She also reported having a lot of pain related to rheumatoid arthritis. (Tr. 126).

Cordts reported having no prior mental health treatment. (Tr. 127). She indicated she had problems with her finances and basically only saw a doctor for rheumatoid arthritis. (Tr. 127). Because of the pain from her arthritis, she indicated she had difficulty completing household tasks. (Tr. 127). Cordts indicated she felt a lot of guilt because her husband did most of the household work. (Tr. 127).

Cordts was observed to be quite depressed with her affect restricted. (Tr. 127). No pathological personality features were noted. (Tr. 127). The diagnosis for Cordts was: Axis I, Adjustment disorder with mixed anxiety and depressed mood; Axis II, Diagnosis deferred; Axis

AO72A
(Rev. 8/82)

III, Rheumatoid arthritis; Axis IV, Problems with primary support group, problems related to the social environment, occupational problems and economic problems; and Axis V, Current global assessment of functioning (GAF) 60, highest GAF in past year also 60. (Tr. 128). It was recommended that Cordts return for psychiatric evaluation and individual therapy. (Tr. 128).

On March 17, 2004, Cordts was seen by Sonja Armstrong, an advanced nurse practitioner. (Tr. 147-149). Cordts reported fatigue, problems sleeping, lack of appetite, without weight loss, isolative behaviors, and tearfulness without triggers. (Tr. 147). She indicated she was socially isolated and drives only minimally related to panic while driving. (Tr. 147).

Cordts mood was dysphoric and affect was depressed and tearful. (Tr. 148). She was having no hallucinations or delusions. (Tr. 148). Insight and judgment were marginal. (Tr. 148). Cognition was within normal limits. (Tr. 148). Her GAF was 55. (Tr. 148). Cordts was started on Zoloft. (Tr. 148).

Cordts did continue individual therapy with Strawn. On May 5, 2004, Strawn noted that Cordts reported she was much improved. (Tr. 146). Cordts reported decreased negatively on medication and better communication with her husband. (Tr. 146). She was not worrying so much and having interest in hobbies although her ability to do hobbies was limited due to rheumatoid arthritis. (Tr. 146).

On June 24, 2004, Cordts was followed by Armstrong. (Tr. 141). It was noted Zoloft had been intolerable for Cordts because it caused unremitting headaches. (Tr. 141). Cordts had been switched to Wellbutrin but it exacerbated diarrhea. (Tr. 141). Cordts was then placed on Paxil CR. (Tr. 141).

AO72A
(Rev. 8/82)

Strawn's notes from July 27, 2004, indicated Cordts was relaxed and doing okay. (T. 140). Cordts reported being more relaxed with being out in public and not worrying about others. (Tr. 140). She was not doing much but didn't mind it. (Tr. 140). She was enjoying time with her husband and taking daily walks. (Tr. 140). She reported some back pain and problems with concentration. (Tr. 140). Strawn noted Cordts had made good progress in decreasing anxiety and the medication appeared to be working well. (Tr. 140).

Strawn's notes from August 24, 2004, indicate Cordts reported that things had gotten worse in the past month or so. (Tr. 177). She was anxious, depressed, and irritable. (Tr. 177). She was more anxious when leaving home and had difficulty shopping if there were more than a few people in the store. (Tr. 177).

Strawn's notes from January 7, 2005, indicate Cordts reported stating to feel very depressed during the week of Thanksgiving. (Tr. 178). She has reported being unable to concentrate and having difficulties with sleeping. (Tr. 178).

On February 2, 2004, Cordts was seen by Dr. Deneke. (Tr. 158). Her diarrhea was noted to be better. (Tr. 158). Cordts' main complaint that day was pain in her lower back. (Tr. 158). She had no swelling of the elbows, writs, hands, knees, or ankles. (Tr. 158).

On March 31, 2004, Cordts was seen by Dr. Trevor Hodge to establish care. (Tr. 134). On physical examination. Dr. Hodge noted she had cyanosis/clubbing of her digits and nails. (Tr. 134). He noted no abnormalities in her extremities, sensation, gait and station, or deep tendon reflexes. (Tr. 134).

An x-ray of her cervical spine revealed a fusion of C6 and C7 otherwise the vertebral body heights were normal and disc spaces preserved. (Tr. 137). No fractures were evident and no significant foraminal stenosis was identified. (Tr. 137).

An x-ray of her lumbar spine show vertebral body heights and disc spaces well preserved. (Tr. 137). There were no alignment abnormalities. (Tr. 137). Early osteophytic changes were noted along the anterior aspect of the lumbar spine at the L2-3, L3-4, and L4-5 interspaces. (Tr. 137).

On April 6, 2004, Dr. Hodge completed a physical residual functional capacity evaluation. (Tr. 129-131). Dr. Hodge indicated Cordts could sit, stand, or walk for only ten to thirty minutes during an entire eight hour day. (Tr. 129). He noted Cordts' legs went numb with prolonged sitting and her legs gave out with standing. (Tr. 129). He indicated she could occasionally lift and carry up to ten pounds and should never lift or carry over ten pounds. (Tr. 129).

Dr. Hodge indicated Cordts' use of her hands for repetitive movement was limited in grasping and fingering. (Tr. 130). Cordts was able to occasionally bend, squat, crawl, climb, reach, stoop, and crouch. (Tr. 130). Dr. Hodge also indicated Cordts had mild to moderate restrictions of activities involving exposure to marked changes in temperature and humidity, exposure to dust, fumes, and gases, and driving. (Tr. 130).

Dr. Hodge indicated his evaluation was supported by Cordts having a history of degenerative disc disease and panic attacks. (Tr. 131). He noted Cordts marked limitations were due to her panic attacks and physically due to her degenerative joint disease. (Tr. 131).

AO72A
(Rev. 8/82)

On May 3, 2004, Cordts saw Dr. Deneke. (Tr. 156). He noted her diarrhea had been controlled until Wellbutrin had been added. (Tr. 156). Cordts still reported having two to three hours of morning stiffness. (Tr. 156).

Upon examination, no swelling of her elbows, wrists, hands, knees, or ankles was noted. (Tr. 156). There was a little tenderness of her left foot. (Tr. 156). Her lumbar spine showed some tenderness at the lumbosacral junction, left SI joint, buttock and greater trochanter. (Tr. 156). Her deep tendon reflexes and strength were intact in the lower extremities. (Tr. 156). The straight leg raising test was negative. (Tr. 156). Dr. Deneke indicated that Cordts' back problem was probably not from rheumatoid arthritis but was probably degenerative as indicated by Dr. Hodge. (Tr. 156).

On August 2, 2004, Cordts was seen by Dr. Deneke. (Tr. 154). Cordts reported having increased her dose of Arava because of increased discomfort. (Tr. 154). She had not noted any increase in diarrhea, no headache, rash, or hair loss. (Tr. 154).

Dr. Deneke noted he did not see clear flare but he felt Cordts' rheumatoid arthritis might not be as controlled as they would like. (Tr. 154). If there was any question of diarrhea starting, Cordts was to use Citrucel and occasional Imodium A.D. (Tr. 154).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d

964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national

AO72A
(Rev. 8/82)

economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Cordts argues the ALJ erred in finding that her mental impairments were not severe. We believe substantial evidence does not support the ALJ's evaluation of Cordts' mental impairment. As the Eighth Circuit has noted, "[t]he evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment." *Vester v. Barnhart*, 416 F.3d 886, 892-893 (8th Cir. 2005). The ALJ found Cordts' depression and anxiety to be non-severe. (Tr. 19). However, in doing so, he stated that the notes from Cordts' treatment with Strawn indicated Cordts' had shown significant improvement in her symptoms and the only continued problems she was having were some problems with back pain and lack of concentration. (Tr. 18). The ALJ further indicated he believed Cordts' symptoms were largely as a result of situations occurring in her home life and that her treatment improved her symptoms. (Tr. 18). The ALJ further found Cordts had no significant functional limitations as a result of the mental impairment. (Tr. 18).

While it does appear Cordts experienced some improvement in her symptoms with medication and individual therapy, *see e.g.,* (Tr. 140, 146), these improvements came at a time when she significantly limited her daily activities. (Tr. 140, 146). Further, there were also times during her treatment when her symptoms increased, she was more depressed and irritable, had difficulty in being around people, and had an increase in panic attack symptoms, *see e.g.* (Tr.

177, 178). In August of 2004, and January of 2005, note was made of the fact that she had moderate symptoms and/or functional deficits, though not always evidence, that interfered with maximum role functioning. (Tr. 177 & 178). On remand, the ALJ should by interrogatory, or other appropriate means, obtain a mental residual functional capacity assessment or some type of assessment regarding Cordts' ability to perform work-related activities.

Cordts also argues it was error for the ALJ to treat Dr. Hodge as an non-treating source and give his assessment less weight than that given to the residual functional capacity assessments completed by non-examining agency medical consultants. According to both Dr. Hodge's records and the hearing testimony, Cordts went to Dr. Hodge to establish a treatment relationship and had seen him on one occasion prior to his completing a residual functional capacity assessment. (Tr. 134, 197). The court agrees Dr. Hodge should not have been considered a non-treating source. *See* 20 C.F.R. § 404.1527. On remand, the Commissioner should consider ordering a consultative examination, or having Cordts' treating physicians complete residual physical functional capacity assessments, and submit interrogatories to Dr. Hodge asking for a further explanation of the assessment he completed.

**Conclusion**:

For the reasons stated, I find that the decision of the Commissioner should be and hereby is reversed and remanded. A separate judgment in accordance with the above will be entered.

Dated this 4th day of October 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)